John J. Kane (SBN 24066794)
S. Kyle Woodard (SBN 24102661)
JaKayla J. DaBera (SBN 24129114)
**KANE RUSSELL COLEMAN LOGAN PC**
901 Main Street, Suite 5200
Dallas, Texas 75202
Tel.: (214) 777-4200
Fax: (214) 777-4299
Email: jkane@krcl.com
Email: kwoodard@krcl.com
Email: jdabera@krcl.com

*Proposed Counsel for Universal*
*Rehearsal Partners, Ltd.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **UNIVERSAL REHEARSAL** | § | **Case No. 22-31966** |
| **PARTNERS, LTD.,** | § | |
| | § | |
| **Debtor.** | § | |

---

### DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

---

Universal Rehearsal Partners, Ltd. (the **"Debtor"**), as debtor and debtor-in-possession in the above-referenced chapter 11 case hereby file this *Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Scheduling a Final Hearing; and (iv) Granting Related Relief* (the **"Motion"**).  In support of the Motion, the Debtor respectfully states as follows:

## BANKRUPTCY RULE 4001 SUMMARY[1]

1.      In accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

**Bankruptcy Rules**"), the following table summarizes the material terms of the proposed interim

order attached hereto (the **"Interim Order"**):

| Summary of Material Terms | | |
|---|---|---|
| **Name of Entity with Interest in the Cash Collateral** | PlainsCapital Bank, a Texas state bank (the **"Lender"**) | Interim Order ¶ E. |
| **Purposes for the Use of the Cash Collateral** | Cash Collateral (defined below) shall be used to fund working capital, operating expenses, capital expenditures, fixed charges, compensation, and all other general corporate purposes arising in the Debtor's ordinary course of business, as set forth in the Budget. | Interim Order ¶ 5. |
| **Duration of Use of Cash Collateral** | Unless extended further with the written consent of the Lender (confirmed by the entry of a further order of this Court), the authorization granted to the Debtor to use Cash Collateral under the Interim Order shall terminate upon the earlier of: (i) end of business on the first business day that is at least 30 calendar days after the Petition Date, or any later date the Lender agrees to in writing; (ii) further Court order terminating the Debtor's use of Cash Collateral; (iii) the date upon which a chapter 11 or chapter 7 trustee is appointed in any of the Bankruptcy Cases; (iv) the conversion of the Debtor's bankruptcy case in Chapter 7; or (v) the occurrence of an Event of Default (as defined below) that is not cured by the Cure Period (as defined below) by the Debtor under the Interim Order. | Interim Order ¶ 5. |
| **Debtors' Stipulations** | (i) As of the Petition Date, the Debtor was a party to the Note, Security Agreement, and Deed of Trust and other Loan Documents with PlainsCapital Bank, the Lender; (ii) as of the Petition Date, the Debtor is liable to the Lender in the amount of $706,807.25 (the **"Prepetition Indebtedness"**), though the Maturity Date is not until March 16, 2023; (iii) the Debtor admits, acknowledges, and does not dispute that, as security for repayment of the Prepetition Indebtedness, Lender holds valid, senior, perfected, and enforceable liens (the **"Prepetition Liens"**) in all of the collateral described in the various Loan Documents, which include substantially all of the tangible and intangible personal property assets of the Debtor as of the Petition Date (collectively, the **"Prepetition Collateral"**); (iv) the Debtor further admits, acknowledges, and does not dispute that: (a) all of the amounts owing to the Lender pursuant to the Loan Documents are legally binding and enforceable obligations of the Debtor; (b) the Loan Documents are valid and enforceable against the Debtor in accordance with their terms; (c) the liens of the Lender in, to, and against all of the Prepetition Collateral are valid, enforceable and properly perfected, and are | Interim Order ¶ E. |

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms below or in the Interim Order.

| Summary of Material Terms | | |
|---|---|---|
| | not subject to avoidance under any state or federal law; and (d) there are no existing claims or causes of action of the Debtor, whether liquidated or unliquidated, direct or indirect, and whether arising under state or federal law (including the Bankruptcy Code) against the Lender, arising from the relationship between the Debtor, on one hand, and the Lender, on the other hand.; and (v) he Lender's Prepetition Collateral includes cash proceeds and other cash equivalents, and all cash and cash equivalent proceeds of the Prepetition Collateral, constituting cash collateral of the Debtor within the meaning of 11 U.S.C. § 363(a) (the **"Cash Collateral"**).  The Cash Collateral also serves as security for repayment of the Prepetition Indebtedness. | |
| **Adequate Protection** | Subject to the Challenge Period and the Debtor's right to file a Challenge Action, the Debtor stipulates and agree that Lender's asserted liens and security interests in the Debtor's Prepetition Collateral are perfected, valid, and not avoidable as of the Petition Date.  The following is provided to the Lender as adequate protection (**"Adequate Protection"**) of the Lender's asserted pre-Petition Date security interests in the Prepetition Collateral.<br><br>a.  **Monthly Note Payments.**  From the Petition Date and until such time as the Debtor no longer uses the Lender's Cash Collateral, the Debtor shall deliver to the Lender monthly payments due under the Loan Documents at the non-default rate as set forth therein as they come due (the **"Adequate Protection Payments"**). The first Adequate Protection Payment required to be made by the Debtor to the Lender under this Interim Order shall be paid when due or, if past due, as soon as reasonably practicable after the entry of this Interim Order.  Each subsequent Adequate Protection Payment shall be paid timely when due under the Loan Documents during the term of this Interim Order.<br><br>b.  **Replacement Liens.**  Notwithstanding anything in section 552 of the Bankruptcy Code to the contrary, the Lender is hereby granted, from and after the Petition Date, replacement liens and security interests in all of the Debtor's assets, including assets acquired after the Petition Date, specifically including all cash proceeds (but excluding any causes of action under chapter 5 of the Bankruptcy Code) (the **"Adequate Protection Collateral"** and, together with the Prepetition Collateral, collectively, the **"Collateral"**), in the same nature, extent, priority, and validity that such liens existed on the Petition Date (the **"Replacement Liens"**).  The Replacement Liens shall secure the Lender to the extent necessary to adequately protect the Lender from any diminution in value of its interests in property of the Debtor's estate as a result of the entry of this Interim Order and the use of Cash Collateral authorized hereby, and shall have the same validity, priority, and enforceability as Lender's liens on the Debtor's assets on the Petition Date; provided, however, the Replacement Liens shall be junior in priority and in payment to the Carve Out (defined below).  The Replacement Liens shall be, and hereby are, granted effective as of the Petition Date, without the necessity of the execution by the Debtor of any security agreement, pledge agreement, financing statement or any other documents, or the necessity of any kind of financing statement or other filing by the Lender.  Notwithstanding the foregoing, this Interim Order shall be deemed a security agreement and may be filed as a financing statement and the Debtor shall execute and deliver such notes, security agreements, assignments, financing | Interim Order ¶ 8. |

| Summary of Material Terms | | | |
|---|---|---|---|
| | | statements and other documents that the Lender shall reasonably requests to further evidence the liens and security interests granted hereby. | |
| | c. | **Super-Priority Claims.** To the extent the Replacement Liens granted to the Lender in this Interim Order do not provide the Lender with adequate protection of its interests in the Cash Collateral, the Lender shall have super-priority administrative expense claims in each of the Bankruptcy Cases under Bankruptcy Code § 507(b) with priority over every other administrative claim of any kind (the **"Super-Priority Claims"**) except the Carve Out.  Subject only to the Carve Out, the Super-Priority Claims of the Lender shall have priority over all other administrative expenses incurred in this case of any kind, including such administrative expenses of the kinds specified in, or allowable under, sections 365(d)(3), 506(c), 507(a) or 507(b) of the Bankruptcy Code.  Other than the Carve Out, no costs or expenses of administration which have been or may be incurred in these proceedings, any conversion of these proceedings pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related hereto, and no priority claims are, or will be, prior to or on parity with the Super-Priority Claims of the Lender. | |
| | d. | The Lender shall have all the rights and remedies of a secured creditor in connection with the liens and security interests granted by this Interim Order, except to the extent that such rights and remedies may be affected by the Bankruptcy Code or the Challenge Period. | |
| **Carve Out** | a. | As used in this Interim Order, **"Carve Out"** means, the sum of (i) all fees and expenses required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the **"Statutory Fees"**); (ii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses accrued or incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the foregoing, collectively, **"Professional Fees"**) before or on the first business day following delivery by the Lender of a written notice delivered by email (or other electronic means) to the Debtor, its lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the Interim Order that is not cured during the Cure Period stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the **"Carve-Out Trigger Notice"**); and (iii) Professional Fees in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the **"Post-Carve-Out Trigger Notice Cap"**); provided that, nothing in the interim shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds. | Interim Order ¶ 9. |
| | b. | On the day on which a Carve-Out Trigger Notice is given by the Lender as set forth herein (the **"Termination Declaration Date"**), the Carve-Out Trigger Notice shall constitute a demand to the Debtor to utilize all cash on hand (including Cash Collateral) as of such date and any available cash | |

| **Summary of Material Terms** | | |
|---|---|---|
| | thereafter held by any Debtors to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the Prepetition Indebtedness, including the Replacement Liens and the Super-Priority Claims granted to the Lender herein. | |
| **Events of Default** | a.  If the Debtor fails to timely deliver to the Lender the Adequate Protection Payments described in this Interim Order; | Interim Order |
| | b.  If the Debtor's actual operating disbursements under the Budget exceed the amounts set forth in the Budget by more than the Budget Variance causing the Debtor to be incapable of making the Adequate Protection Payments, unless with the prior written consent of the Lender or further authority from the Court; | ¶ 10. |
| | c.  If the Debtor pays obligations not shown on the Budget without the prior written consent of the Lender or further authority from the Court; | |
| | d.  If any representation made by the Debtor after the commencement of the Bankruptcy Case in any report or financial statement delivered to the Lender proves to have been knowingly false or misleading in any material respect as of the time when made or given (including by omission of material information necessary to make such representation, warranty or statement not misleading) | |
| | e.  The Debtor fails to timely provide the information required under Paragraph 7 of this Interim Order and such failure continues for more than three (3) business days following written request by Lender; | |
| | f.  If a trustee or examiner, with authority to affect the operation of the Debtor's businesses, is appointed in these Bankruptcy Cases without the Lender's consent; | |
| | g.  If any of these Bankruptcy Cases is converted to a case under chapter 7 of the United States Bankruptcy Code; or | |
| | h.  If the Debtor violates an obligation under the Interim Order. | |
| **Remedies** | Upon the occurrence of a default or breach by the Debtor under the Interim Order, then if the Lender intends to declare a default under the terms of this Interim Order (an **"Event of Default"**), the Lender shall first give written notice, stating with specificity the nature of the alleged Event of Default to: (a) the Debtor; (b) the Debtor's bankruptcy counsel, and (c) counsel for the U.S. Trustee (which notice may be given by electronic transmission, the automatic stay being deemed lifted for such purpose) (the **"Default Notice"**).  With respect to an Event of Default as to which a Default Notice has been delivered by the Lender in accordance with this Interim Order, the Debtor shall have five (5) business days from the receipt of the Default Notice to cure the alleged Event of Default (the **"Cure Period"**).  If the Lender believes that the Event of Default(s) set forth in the Default Notice has not been cured by the expiration of the Cure Period, then the Lender shall file a pleading stating with specificity the nature of the Event of Default that was not cured  or otherwise remains outstanding (**"Lender Default Motion"**) and shall be entitled to an emergency hearing on no  earlier than five (5) business days prior notice via email and ECF upon the Debtor, | Interim Order<br><br>¶ 11. |

| Summary of Material Terms | | |
|---|---|---|
| | Debtor's counsel, and the United States Trustee, to seek Court approval to exercise its rights and remedies under the Loan Documents, modify or terminate the automatic stay under 11 U.S.C. § 362 or otherwise seek relief from the Court. Upon the Lender's filing of a Lender Default Motion, the Debtor shall cease using Cash Collateral pending further Court Order, except for the payment of utilities and security expenses necessary to preserve Lender's Collateral.  Nothing in this Interim Order shall preclude the Debtor from filing an Emergency Motion to use Cash Collateral. | |
| **Challenge Period** | Notwithstanding any other provisions of this Interim Order, any interested party in these cases shall have until the date that is 30 calendar days from the Petition Date (such period, the **"Challenge Period"**), to commence an adversary proceeding against the Lender for the purpose (collectively, a **"Challenge Action"**) of challenging the validity, extent, priority, perfection, enforceability and non-avoidability of the Lender's Prepetition Liens against the Prepetition Collateral.  All parties in interest that fail to commence a Challenge Action prior to the expiration of the Challenge Period shall be barred forever from commencing a Challenge Action and shall be bound by the Stipulations and terms set forth in this Interim Order | Interim Order ¶ 12. |
| **Binding Effect** | This Interim Order shall be immediately effective as an interim order.  Within two (2) business days, the Debtors shall promptly serve a copy of this Interim Order on: (i) the Office of the United States Trustee; (ii) all creditors the Debtor knows either have, or may assert, liens or other charges against the Debtor's assets; (iii) the parties on the Debtor's proposed Service List, and (iv) any other party or counsel that has filed a request for special notice with this Court.  Any other further obligation for notice of the relief granted herein shall be, and hereby is, dispensed with and waived | Interim Order ¶ 15. |

## JURISDICTION AND VENUE

2.      The United States District Court for the Northern District of Texas (the **"District Court"**) has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334.  The District Court's jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984.  This is a core matter pursuant to 28 U.S.C. § 157(b), which may be heard and finally determined by this Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.      OVERVIEW OF THE DEBTOR AND THE CAUSES OF ITS BANKRUPTCY FILING**

3.      Universal Rehearsal Partners, Ltd. (the **"Debtor"**) is a Texas limited partnership formed in 2001 between John Kirtland (**"Kirtland"**) and Vince Barnhill (**"Barnhill"**) for the acquisition of certain real property and the operation at that property of a business that leases practice rooms and rehearsal spaces to musicians and bands.  To memorialize their agreement, Kirtland and Barnhill had previously entered into and executed an *Agreement of Limited Partnership of Universal Rehearsal Partners, Ltd.* dated September 26, 2000 (the **"LP Agreement"**).  Pursuant to the LP Agreement, Kirtland would own 50% of the limited partnership as the Limited Partner, while Barnhill would own 50% as the General Partner.  To effectuate the LP Agreement, Kirtland provided $109,000 in cash to help the Debtor acquire real property on which to operate the business located at 9150 and 9142 Markville, Dallas, TX 75243 (the **"Property"**).  In addition, Kirtland personally guaranteed more than $900,000 in debt incurred by the Debtor when acquiring the Property.  Barnhill was, in essence, the sweat equity, charged with operating the Debtor's business at the Property in exchange for his 50% partnership interest.

4.      Over time, Barnhill began to violate various provisions of the LP Agreement.  For instance, Barnhill failed to properly provide and obtain approval for annual operating budgets as required.  Barnhill failed to escrow and pay the Debtor's real property taxes in a timely manner, often requiring Kirtland to make capital contributions to avoid ad valorem tax liens and the accrual of penalties and interest.  Barnhill failed to distribute compensation from the Debtor's operations equally with Kirtland, though obligated to do so under the LP Agreement.  Barnhill paid himself and his d/b/a affiliates compensation from the Debtor without obtaining the authorizations required under the LP Agreement.  From 2012 through 2015, Barnhill failed to cause the Debtor to file required franchise tax reports with the State of Texas, resulting in the forfeiture of the Debtor's right to conduct

business in 2012 and again in 2014.  Barnhill failed to remedy the Debtor's forfeiture from 2014 through 2016.  Barnhill failed to cause the Partnership to file its federal tax returns on time (or at all) in some years.  Barnhill failed to keep accurate books and records of the Partnership's operations, instead creating a set of books showing lower income which he reported on the Partnership's tax returns while also keeping an alternate, internal set of books and records showing higher income.

5.      As Barnhill's operation of the Debtor grew increasingly erratic and unprofessional, Kirtland learned from the Debtor's former CPA, Thad Tatum, that Barnhill may have been misappropriating funds from the Debtor.  Kirtland's initial investigation into these matters revealed a decline in revenue and profits, potentially associated with Barnhill's acceptance and misappropriation of cash payments from customers, Barnhill's self-dealing through d/b/a entities owned by Barnhill, Barnhill's misuse of rentable business space, and other violations of the LP Agreement.

6.      Declining reported revenue and increased reported costs eventually led to a breach of financial covenants in the Debtor's loan documents with PlansCapital Bank (**"Lender"**).  As a result of the Debtor's covenant defaults, Lender has indicated to the Debtor that it will not extend the March 16, 2023 maturity date (the **"Maturity Date"**) of its loan, evidenced by a Promissory Note between the Debtor and Lender dated March 16, 2016 in the original principal amount of $929,000 (the **"Note"**).  The Debtor's Note obligation to Lender is secured by the Property pursuant to a Loan and Security Agreement dated March 16, 2016 (the **"Security Agreement"**), and a Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement in favor of Lender recorded on June 6, 2016 (the **"Deed of Trust"** and collectively, with any other related loan documents, the **"Loan Documents"**).

7.      On November 12, 2021, Kirtland removed Barnhill as General Partner in an effort to stabilizing business operations, increase revenue, and ensure transparency and appropriate financial controls.  In doing so, Kirtland cited no less than 11 grounds for Barnhill's removal under section 4.11

of the LP Agreement. With appropriate notice, and having satisfied all express requirements of the LP Agreement, Kirtland concurrently appointed Q PM, LLC, a Texas limited liability company (**"QPM"**), as the Debtor's new General Partner.

8.    Under the terms of the LP Agreement, when a GP is removed, the replacement GP becomes a 1% interest holder in the Debtor. The 1% ownership interest is transferred automatically from the preceding GP's interest in the Debtor. Accordingly, QPM is 1% interest owner of the Debtor, and Barnhill became a 49% interest owning limited partner. Kirtland remains a 50% interest holder.

9.    Shortly after his removal, Kirtland's litigation counsel retained reputable CPA and Certified Fraud Examiner Paula Field of Lucrum Accounting to perform a fraud analysis of the Debtor and its available books, records, tax returns, bank account statements, and other information. On August 4, 2022, Ms. Field produced her initial Certified Fraud Examiners Report, finding $934,473 of unreported earnings, a difference of more than $667,000 of compensation paid to Barnhill than Kirtland, despite the LP Agreement requirement of equal compensation, and more than $163,000 of misallocated capital contributions owing to Kirtland. In total, Ms. Field determined that under the terms of the LP Agreement, Kirtland would be entitled to more than $1,335,029 of distributions before the Debtor could pay any additional money to Barnhill.

10.    Despite his removal and the Certified Fraud Examiner's findings, Barnhill continued to act as General Partner of the Debtor. Barnhill continued to appear at the Property, continued to interact with customers, and on information and belief, continued to collect cash payments or electronic payments directly from customers at the expense of the Debtor. During 2022, monthly revenue dropped to as little as $9,888.45 in April, despite $27,930 of reported income the preceding year. Average monthly income for 2022 has dropped to $14,577, well below 2020's covid-affected reported average monthly income of $19,717.06, and far below 2021's reported average monthly

income of $24,221.85.

11.     According to Kirtland, Barnhill has gone so far as to deny Kirtland and QPM access to the Property, has locked Kirtland and QPM out of rooms within the Property, has confronted Kirtland at the Property while armed with a pistol, and has physically assaulted Kirtland while Kirtland entered the Property.  Given Barnhill's behavior, including the use of a pistol to intimidate Kirtland from securing the Property, the Debtor's current General Partner, QPM, has expressed safety concerns about taking possession of the Property from Barnhill.

12.     The result is an untenable situation in which QPM cannot properly operate the Debtor and maximize revenue due to Barnhill's inappropriate behavior.  Even despite pending litigation, neither Kirtland nor QPM have been able to secure the Property from Barnhill.  Given the upcoming Maturity Date obligation, and the Debtor's lack of means to pay that obligation from cash on hand, the Debtor is compelled to file for bankruptcy relief, and to administer its assets pursuant to Title 11 of the United States Code (the **"Bankruptcy Code"**).

13.     On October 21, 2022 (the **"Petition Date"**), the Debtor commenced this case (the **"Bankruptcy Case"**) in the United States Bankruptcy Court for the Northern District of Texas (the **"Bankruptcy Court"**) by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested or appointed in this Bankruptcy Case.

B.     **DEBTOR MUST USE CASH COLLATERAL TO AVOID IMMEDIATE AND IRREPARABLE HARM**

14.     If not allowed to use cash collateral, the Debtor would suffer immediate and irreparable harm.  First, the Debtor would go dark and become incapable of renting practice and rehearsal space to customers.  Normal business operations generate sufficient cash flow to pay ordinary course of business expenses.  Precluding the use of cash collateral would also preclude the

Debtor from generating income.  That lack of income would result in the accrual of obligations of the

estate, with no means to meet those accruing obligations.  Recommencing operations, even more so

than already required as a result of Barnhill's interference, would be difficult, time consuming, and

costly.  At some point, the Debtor's inability to provide space to its paying customers would result in

a loss of market share, lost relationships, and serious damage to the Debtor's business operations.

That damage may devalue the Debtor's assets or going concern value, should the Debtor pursue a sale

in this Bankruptcy Case.  In short, without use of Cash Collateral, the Debtor, its assets, its creditors

and its equity interest holders would be severely and irreparably harmed and damaged.

## <u>RELIEF REQUESTED</u>

15.     The Debtor requests pursuant to sections 105, 361, 362, and 363 of the Bankruptcy

Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014:

a.      authorization for the Debtor to (i) use Cash Collateral, and all other Prepetition Collateral solely in accordance with the terms of the Interim Order and material compliance with the 4-week cash disbursements and the authorized disbursements under the budget annexed hereto as **<u>Exhibit A</u>** (as such budget may be modified from time to time, the **"Budget"**), and (ii) provide adequate protection to the Lender under the Loan Documents;

b.      that this Court hold an interim hearing on the Motion on an expedited basis to consider the relief requested in this Motion and entry of the proposed Interim Order;

c.      that this Court schedule a final hearing (the **"Final Hearing"**) to consider entry of a final order (the **"Final Order"**) granting the relief requested in this Motion on a final basis;

d.      modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary, to implement and effectuate the terms and provisions of the Interim Order and the Final Order;

e.      waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including, without limitation, a waiver pursuant to Bankruptcy Rule 6004 and a waiver of the applicability of Bankruptcy Rule 4001(a)(3)); and

f.      that the Court grant such further and other relief as is just and proper.

## BASIS FOR RELIEF REQUESTED

### A.    EMERGENCY RELIEF

16.    The Debtor brings this Motion on an emergency basis given the immediate and irreparable harm that the Debtor will potentially suffer if it is denied the ability to use Cash Collateral, which is necessary to sustain ongoing business operations and to preserve the value of its assets for the benefit of the Debtor's estate.

17.    Absent the continued use of Cash Collateral, the Debtor would likely have to cease its ongoing operations to the material detriment of its creditors, stakeholders, and other parties in interest. Therefore, the Debtor needs to ensure the availability of its working capital now.

### B.    ADEQUATE PROTECTION AND CASH COLLATERAL

18.    Pursuant to Bankruptcy Code § 363(c)(2), a debtor-in-possession may not use cash collateral without the consent of its lender or court approval. 11 U.S.C. § 363(c)(2). Bankruptcy Code § 363(e) provides that, upon request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

19.    The Bankruptcy Code does not expressly define "adequate protection" or proscribe a particular form that it must take. *See In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection") (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987)). Generally, courts decide what constitutes adequate protection on a case-by-case basis. *See In re First S. Sav. Ass'n*, 820 F.2d at 710 (noting, with respect to adequate protection, that "'[i]ts application is left to the vagaries of each case'") (quoting *In re Becker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *Resolution Tr. Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.") (citing *In re*

*O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry.").   The focus of the adequate protection requirement is to protect a "secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection . . . is to safeguard the secured creditor from diminution in the value of its interests."); *In re Beker*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

## C.      THE DEBTORS' PROPOSED ADEQUATE PROTECTION FOR THE USE OF CASH COLLATERAL

20.      The Lender asserts liens on the Debtor's Cash Collateral.  As adequate protection for the Debtor's use of the Cash Collateral, the Debtor will provide the Lender with, among other protection, adequate protection payments of interest and replacement liens.

21.      **Principal and Interest Payments**.  The Debtor was not in a payment default at the time it commenced this Bankruptcy Case.  The Debtor will continue to make all payments timely as due under the prepetition Loan Documents (the **"Adequate Protection Payments"**) from the Petition Date until the Debtor no longer uses the Lender's Cash Collateral.  The Adequate Protection Payments will be paid by the Debtor to the Lender on or before the applicable due date set forth in the Loan Documents, with interest accruing at the non-default rate.

22.      **Replacement Liens**. As further adequate protection, the Debtor will grant the Lender valid and automatically perfected (without necessity of the execution of additional mortgages, security agreements, pledge agreements, financing statements, or other documents) replacement liens and security interests in substantially all of the Debtor's assets, to the same extent, validity and priority, as the Lender's liens and security interest as of the Petition Date, specifically including all cash proceeds

arising from the Prepetition Collateral, including accounts receivable and other assets acquired after the Petition Date (but excluding any causes of action under chapter 5 of the Bankruptcy Code and proceeds thereof), in the same nature, extent, priority, and validity that such liens existed on the Petition Date (the **"Replacement Liens"**).  The Replacement Liens will secure the Lender to the extent necessary to adequately protect the Lender from any diminution in value of its interests in the property of the Debtor's estates as a result of the use of Cash Collateral.  The Replacement Liens, however, will be junior in priority and payment to the Carve Out (as defined below).

23.    **Super-Priority Claim**.  To the extent the Replacement Liens granted to the Lender in this Interim Order do not provide the Lender with adequate protection of its interests in the Cash Collateral, the Lender shall have, upon notice and hearing and a subsequent Court Order, super-priority administrative expense claims in the Bankruptcy Cases under Bankruptcy Code § 507(b) with priority over every other administrative claim of any kind (the **"Super-Priority Claims"**), except the Carve Out.  Subject to the Carve Out and further Court Order, the Super-Priority Claims of the Lender shall have priority over all other administrative expenses incurred in this case of any kind, including such administrative expenses of the kinds specified in, or allowable under, sections 365(d)(3), 506(c), 507(a) or 507(b) of the Bankruptcy Code.  Other than the Carve Out, no costs or expenses of administration which have been or may be incurred in these proceedings, any conversion of these proceedings pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related hereto, and no priority claims are, or will be, prior to or on parity with the Super-Priority Claims of the Lender.  The Lender shall have all the rights and remedies of a secured creditor in connection with the liens and security interests granted by this Interim Order, except to the extent that such rights and remedies may be affected by the Bankruptcy Code or the Challenge Period.

24.    **Reporting Requirements**.  The Debtor will continue to provide the Lender with the information and otherwise fulfill its reporting requirements as set forth in the Loan Documents.

25.     The proposed Adequate Protection, outlined above and as set forth in the proposed Interim Order, is sufficient to secure the Debtor's projected use of Cash Collateral because the projected diminution in value, if any, from the use of Cash Collateral is less than the value of the Adequate Protection proposed to the Lender.  Significantly, the Debtor proposes to pay all Note payments due at the non-default rate as and when due under the Prepetition Loan Documents. Moreover, the use of Cash Collateral is itself a form of Adequate Protection by preserving or even increasing the value of the Debtor's overall going concern value by operating during the restructuring process.  *See, e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing) (citing *Bank of New England v. BWL, Inc.*, 121 B.R. 413, 418 (D. ME. 1990)).

**D.      THE USE OF CASH COLLATERAL IS NECESSARY TO PRESERVE ASSETS OF THE ESTATES**

26.     The Debtor requires immediate access to liquidity to ensure that they are able to continue operating during this Bankruptcy Case and to preserve the value of its estate for the benefit of all parties-in-interest.  Substantially all of the Debtor's total cash on hand as of the Petition date is subject to the liens of the Lender and thus constitutes Cash Collateral.

27.     The Debtor continues to incur expenses associated with the management of its ongoing operations, the protection and maintenance of its assets, and the administration of its estate during the course of this Bankruptcy Case.  The Debtor's ability to use Cash Collateral will allow the continuation of the Debtor's existing operations and lending relationships.

**E.      CARVE OUT IS APPROPRIATE**

28.     For purposes hereof, the **"Carve Out"** means, the sum of (i) all fees and expenses required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below)

(collectively, the **"Statutory Fees"**); (ii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses accrued or incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the foregoing, collectively, **"Professional Fees"**) before or on the first business day following delivery by the Lender of a written notice delivered by email (or other electronic means) to the Debtor, its lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the Interim Order that is not cured during the Cure Period stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the **"Carve-Out Trigger Notice"**); and (iii) Professional Fees in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the **"Post-Carve-Out Trigger Notice Cap"**); provided that, nothing in the interim shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

29.    On the day on which a Carve-Out Trigger Notice is given by the Lender as set forth herein (the **"Termination Declaration Date"**), the Carve-Out Trigger Notice shall constitute a demand to the Debtor to utilize all cash on hand (including Cash Collateral) as of such date to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing Prepetition Indebtedness, including the Replacement Liens and the Super-Priority Claims.

30.    The Carve Out is similar to other provisions of this type, which have been found to be reasonable and necessary to ensure that the Debtors' estates and any statutory committee can retain assistance from counsel. *See In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990)

("Indeed, it has been the uniform practice of this Court … to insist on a carve out … in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.").

31.     Without the Carve Out, the Debtor's estate and other parties-in-interest may be deprived of possible rights and powers because all of the Debtor's assets would be subject to prior security interests.  *See In re Ames Dep't Stores Inc.*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out also protects against the possibility of administrative insolvency by ensuring that assets remain available for the payment of statutory and professional fees.  Accordingly, the Court should approve the Carve Out.

## F.     THE AUTOMATIC STAY SHOULD BE MODIFIED TO A LIMITED EXTENT

32.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtor and the Lender to perform the transactions and actions contemplated or permitted by the Interim Order.

33.     The stay relief provisions are a reasonable exercise of the Debtor's business judgment, are appropriate under the present circumstances, and, accordingly, should be approved.

## G.     INTERIM RELIEF IS WARRANTED

34.     Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion to use cash collateral may not be commenced before 14 days after service of the applicable motion.  FED. R. BANKR. P. 4001.  This Court may, however, conduct a preliminary hearing before the expiration of that fourteen-day period and likewise authorize the use of Cash Collateral, if necessary, to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *Id.*

35.     The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein authorizing the Debtor to use the Cash Collateral is not granted promptly.  The

Debtor believes that the commencement of this Bankruptcy Case has already and will continue to significantly increase the demands on its cash as a result of, among other things, the costs of administering this Bankruptcy Case, securing the Property, revitalizing operations, and addressing key constituents' concerns regarding the Debtor's financial health and ability to continue operations. The Debtor has an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of its business and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtor's going concern value and the value of the Debtor's assets for the benefit of all parties in interest.

36.     The alternative in this case is "to force the debtor to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case." *In re Dynaco Corp.*, 162 B.R. 389, 396 (Bankr. D.N.H. 1993) (alteration in original). This result would be at fundamental odds to the rehabilitative purposes of Chapter 11, therefore, approval of this Motion is warranted. *Id.* at 394 (noting that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible") (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

37.     In examining requests under Bankruptcy Rule 4001, courts apply the same business judgment standard applicable to other business decisions. *See In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39–40 (Bankr. S.D. N.Y. 1990). The Debtor submits that, for the reasons set forth herein, the immediate use of Cash Collateral, on an interim basis, as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtor's businesses and its estate. After the 14-day period, however, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the Debtor's business.

38.     The Debtor requests that the Court conduct an emergency preliminary hearing on the

Motion and authorize the Debtor, from and after the entry of the Interim Order until a Final Hearing

on the relief requested herein, to use Cash Collateral, as necessary.  Such authorization will ensure that

the Debtor maintains ongoing operations and avoids immediate and irreparable harm and prejudice

to its estate and all parties in interest pending the Final Hearing.

39.      Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order

is necessary to avert immediate and irreparable harm to the Debtor's estate and is consistent with, and

warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## H.      REQUEST FOR FINAL HEARING

40.      As noted above, pursuant to Bankruptcy Rules 4001(b)(2), the Debtor respectfully

requests that the Court set a date for the Final Hearing at the earliest date and time of the Court's

convenience that will ensure adequate notice and due process to all parties-in-interest to this

Bankruptcy Case.

41.      The Debtor respectfully requests that they be authorized to serve a copy of the signed

Interim Order, which fixes the time and date for the filing of objections, if any, by first-class mail on

the Notice Parties (as defined below) and to any other party that has filed a request for notices with

this Court, if the same shall have filed a request for notice.  The Debtor respectfully requests that the

Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

## I.      BANKRUPTCY RULE 6003 HAS BEEN SATISFIED

42.      Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use,

sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay

all or part of a claim that arose before the filing of the petition" before twenty-one days after filing of

the petition.  Here, the Debtor believes an immediate and orderly transition into Chapter 11 is critical

to the viability of its business operations.  Any delay in granting the relief requested could hinder the

Debtor's business operations and cause irreparable harm to the Debtor's estate, thus threatening the Debtor's ability to reorganize successfully. Accordingly, the Debtor has satisfied the requirements of Bankruptcy Rule 6003.

**J.     REQUESTS FOR BANKRUPTCY RULES 4001 AND 6004 WAIVERS**

43.     The Debtor requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h). As explained above and in the Kirtland and Morriss Declarations, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

## NOTICE

44.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the Lender and its counsel; (iii) any party whose interests are directly affected by this specific pleading; (iv) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; (v) counsel for Vince Barnhill; (vi) counsel for John Kirtland; (vii) the Debtor's 20 largest unsecured creditors; and (viii) all governmental agencies having a regulatory or statutory interest in these cases (collectively, the **"Notice Parties"**). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no further notice is required.

## PRAYER

**WHEREFORE**, based on the foregoing, the Debtor respectfully requests that the Court (i) grant the Motion, and (ii) grant such other and further relief as is just and proper.

DATED:  October 21, 2022

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By:  ___/s/ John J. Kane_____

**John J. Kane**
Texas State Bar No. 24066794
**S. Kyle Woodard**
Texas State Bar No. 24102661
**JaKayla J. DaBera**
Texas State Bar No. 24129114

Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Telecopier: (214) 777-4299
E-mail: jkane@krcl.com
E-mail: kwoodard@krcl.com
E-mail: jdabera@krcl.com

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**